MICHAEL TORLOTTING, Respondent, v. MINA TOR-
LOTTING, Appellant.

St. Louis Court of Appeals, December 12, 1899.

1. **Divorce: ADULTERY CONNIVED AT: NO DVIORCE: BILL DIS-
   MISSED.** Respondent hired as a detective, one White, *alias* Mor-
   gan, to furnish him ocular proof of his wife's infidelity. White
   planned an assignation between himself and respondent's wife, ap-
   pellant herein, at a certain place and time, and notified respondent
   that he could in an adjoining room by means of openings in the par-
   tition see her commit the act of adultery; he attended, saw and was
   satisfied: Held, under the circumstances, respondent was consent-
   ing to the act of which he complained within the meaning of section
   4507, Revised Statutes 1889, and ruled against his having a divorce,.
   reversed the cause, and ordered his bill dismissed.

2. ———: **FINDING BY LOWER COURT: NOT CONCLUSIVE.** The
   appellate court will examine the evidence in a divorce suit, for itself
   and reach its own conclusions, yet when the testimony is oral and
   conflicting, much deference will be given to the findings of facts by
   the trial court.

3. ———: **CLEAN HANDS: INNOCENT.** A party seeking a divorce
   must, as in a court of equity, come into court with clean hands, he
   must be both an injured and innocent party.

4. ———: ———: ———: **PRINCIPAL BOUND BY AGENT.** White
   was respondent's agent, was hired and not restricted as to the means
   to employ to compass his object, and was expected to furnish the
   wanted evidence, which circumstance, under the law of agency,
   places respondent in the unequivocal attitude of conniving at and con-
   senting to his wife's adulterous act.

5. ———: ———: ———: **DISCOVERY.** The husband may employ
   agents to watch his wife for the purpose of discovering whether she
   is guilty or not, as suspected, and he is only required to permit his
   wife to proceed far enough in the commission of the act to discover
   to a certainty her lewd disposition.

Appeal from the St. Louis City Circuit Court.—*Hon.
Franklin Ferris*, Judge.

REVERSED (*Bill ordered dismissed.*)

Torlotting v. Torlotting.

*Martin & Bass* for appellant; *H. A. Loevy* of counsel for appellant.

(1) Appellant did not commit adultery. (2) Adultery is a voluntary act of sexual intercourse by a man and a married woman. 1 Am. and Eng. Ency. of Law, 209. If appellant had intercourse with Morgan (which is not admitted), it was while she was under the influence of drugs, administered by him, and therefore, the act was not voluntary on her part, and she can not be held responsible for what occurred. (3) Respondent connived at and procured the intercourse and paid for it. This defeats the assertion of the act as a ground for divorce. Davis v. Davis, 60 Mo. App. 556; 1 R. S. 1889, sec. 4507; Morrison case, 136 Mass. 310; Pierce case, 3 Pick (Mass.) 299; Hadden case, 21 N. J. Eq. 61; Myers case, 41 Barb. N. Y. 114; Gower case, Law Rep., 2 P. & D. 428, 433; Karger case, 19 N. Y. Misc. R. 236; Helmes case, 24 Ib. 125; Dennis case, 68 Conn. 186; Gipps case, 33 L. J., P. M. & A. cases, 163; Crewe case, 3 Hagg. Eccles. 129; Rogers case, Ib. 59, 60; Hoar case, Ib. 137. (4) Where the complaining party in a divorce case is shown to have been guilty of such conduct as would entitle the defendant to a divorce, the petition will be dismissed. Morrison case, 62 Mo. App. 301; Nichols case, 30 Mo. 291; Neff case, 20 Mo. App. 191; Hoffman case, 43 Mo. 550. (5) "If it shall appear to the court that the adultery, or other injury or offense complained of, shall have been occasioned by the collusion of the parties * * * on that the complainant was consenting thereto * * * then no divorce shall be granted." 1 R. S. 1899, p. 1031, sec. 4507. Complainant in this case did consent, not passively, but actively, not only consented from the standpoint of mere acquiescence, but actually procured and paid for the commission of the act he complained of. "For specific causes of marriage relation may be dissolved, but he or she who is instru-

mental in producing the cause can never avail himself of it."
(48 Mo. App. 208, 211; 43 Mo. 547, 551; 26 Mo. 545; 28
Mo. 60; 29 Mo. 301.) Davis v. Davis, 60 Mo. App. 556. "One
instance of adultery was proved, but there is reason to think
the husband was the case of its being committed. It would
be a dangerous principle to establish that a husband who
has suspicions of the infidelity of his wife shall be allowed to
lay a train which may lead her to the commission of adultery
in order that he may take advantage of it to obtain a divorce."
Case dismissed. Pierce Case (Ch. J. Barker), 3 Pick. 299. "I
desire to state distinctly and broadly that, in my opinion, if a
husband employs a man to get evidence of adultery upon
which to obtain a divorce and that man so employed sets
about to procure the defilement of the wife, and by the inter-
vention of that man the wife is purposely induced to commit
adultery, the petitioner has no right to a remedy for such
adultery, even if it were proved that he had not given any
distinct orders for that purpose." Gower case, 2 Law Rep.
P. & D. 428, 429.

*Jesse A. McDonald* for respondent.

(1) "Her story as to believing herself in a real estate
office, and that she was drugged, I reject entirely. It does
not appear that there was any element of temptation, or seduc-
tion, or opportunity for the same on the part of Morgan. I
am impressed with the belief, from all the evidence, that
defendant was ready and willing when she first met Morgan
to respond to a criminal invitation from him  *  *  *  The
law deals with facts, and the charge of adultery in this case
must rest upon the act of adultery committed." The evidence
sustains this finding and the appellate court may therefore
refuse to interfere. Brewing Co. v. Brewing Co., 47 Mo.
App. 21; Rawlins v. Rawlins, 102 Mo. 567; Nichols v.
Nichols, 39 Mo. App. 294; Owens v. Owens, 48 Mo. App. 212.

(2)  Respondent did not, as contended by appellant, consent to the adultery proved against her.  He, on ample grounds, suspected his wife of infidelity and employed detective White to watch her and let him know if she was doing wrong, which he had a right, under the law, to do.  Riersen v. Riersen, 52 N. N. Sup. 509; Wilson v. Wilson, 154 Mass. (1891) 194; Welch v. Welch, 50 Mo. App. 398; Robbins v. Robbins, 140 Mass. 541; Moorsen v. Moorsen, 3 Hagg. Eccl. Rep. 87; Phillips v. Phillips, 1 Rob. Eccl. Rep. 160; 2 Bishop on Mar. Div. & Sup. [5 Ed.], sec. 9; St. Paul v. St. Paul, L. R. 1 P. and D. 739; Timmings v. Timmings, 3 Hagg. Eccl. Rep. 81. The appellant's fourth contention for reversal—that respondent is not entitled to a divorce because he was guilty of conduct which would have entitled her to one—was not pleaded, or sustained by the proof, or found as a fact, though all the evidence offered relative thereto was admitted by the trial court.  It will be assumed that the court found the fact to the contrary and that proposition may, therefore, be concluded as to this honorable court.  Stevenson v. Stevenson, 29 Mo. 95; Miller v. Miller, 14 Mo. App. 428; Owens v. Owens, 48 Mo. App. 212; Nichols v. Nichols, 39 Mo. App. 294.  "If the plaintiff consents to, or connives at, or procures the adultery of the defendant, or it is done with his privity, as it is called, then he has no cause of action.  The question is, and the question which has been discussed in this case somewhat as a question of law is, what constitutes consent, connivance or privity?"  It is practically conceded in this case, at least it is the contention on the part of the defendant's witnesses, that the plaintiff suspected the defendant was about to commit an act of adultery with Gulley.  Of course, it follows that he could have prevented it.  It is claimed by the defendant that because he could have prevented it, or at any rate, as I understand it under the circumstances of the case, that it amounted to consent, connivance, privity or procurement.  The court does not so understand the law, and states it

differently.   In the language of one of the cases: "There is a manifest distinction between the desire and intent of a husband that his wife, whom he believes to be chaste, should commit adultery, and his desire and intent to obtain evidence against his wife, whom he already believes to have committed adultery and to persist in her adulterous practice whenever she has an opportunity."   While the contention of the defendant is supported by the case of Karger v. Karger, 19 Misc. Rep. 236, or 24 N. Y. Supp. 219, yet we think that such case does not announce a sound rule of law upon this subject, inasmuch as it omits to recognize the distinction which was made by the learned trial court in the charge above quoted which has the support of authority in the court of final resort in this state.  Pettee v. Pettee, 28 N. Y. Supp. 1067, affirmed without opinion, 148 N. Y. 735.  In this regard we might prolong the discussion and show that the rule adopted by the court had been uniformly recognized from the decision in Moorsom v. Moorsom, 3 Hagg. Eccl. Rep. 87, down to the present time, both in England and in this country.   *   *   * In St. Paul v. St. Paul, L. R., 1 P. and D. 739.

BLAND, J.—The suit is for divorce and the custody of two minor children.   The ground for divorce, alleged in the petition and relied on at the trial, is that on Friday, October 7, 1898, the defendant met a man at a rooming house on Olive street (in the city of St. Louis, Missouri), and committed adultery with him.   The answer is a general denial.   At the date of the trial the plaintiff was 58 and the defendant 44 years of age; they had been married for 28 years; had six children, and some grandchildren.   A decree of divorce was awarded the plaintiff.   Defendant appealed.

The evidence is before us in the form of printed abstracts. The learned circuit judge who tried the cause made the following finding of the facts and statement of the law as applicable to the facts as he found them.

Torlotting v. Torlotting.

"Speaking of the evidence generally, and considering the manner, appearance, interest, and sympathies of the witnesses, I think the testimony given on behalf of the plaintiff more reliable in character than that given on behalf of the defendant.

"I find the following facts bearing upon the charge of adultery: For some time prior to October, 1898, plaintiff suspected that his wife was unfaithful to her marriage vows. I find that he had ample grounds for such suspicion. Her conduct with reference to going out against his objections, and refusing explanations to him. Her remarks to others about him, and about other men, repeated to him. The fact that she went to the house of the witness, Mrs. Becker, and engaged a room for herself and a male companion (she did not however, return to occupy the room, although a man called at the appointed time), which fact was communicated by Mrs. Becker to plaintiff. These facts, together with all the facts detailed in evidence, would justify plaintiff's suspicions, if not the actual belief, he entertained that his wife was, in point of fact, unfaithful. The testimony of Mrs. Becker, if true, could point to no other conclusion.

I was impressed with the truthfulness of Mrs. Becker's evidence. Her manner was favorable to this impression. Her weak effort to qualify her identification of defendant, when recalled by defendant for that purpose, strengthened in my mind the force of her original testimony; especially when considered in connection with her cross-examination upon her deposition.

"After acting upon this belief in his wife's infidelity, plaintiff employed a detective, White, by name, to watch defendant and to report to plaintiff any facts which he might discover, and particularly to inform plaintiff, in case he should discover that defendant was going to meet a man for sexual intercourse, in order that plaintiff might obtain ocular proof of the fact. I find that in employing this detective, plaintiff's only purpose was to secure proof of the facts which he believed, or at least

strongly suspected to exist. There is no evidence tending to show that plaintiff in any way directed this detective as to how he should proceed.

"On October 8, 1898, at about two p. m., White showed plaintiff a letter or note which reads as follows:

"Dear Mr. Morgan: I can not get out to-night. You try and come to-morrow morning.

Yours truly,
(Signed)                                        Mrs. Torlotting.'
and informed plaintiff that defendant was going to meet this man Morgan that afternoon at 4:30 at his (Morgan's) room No. 1812 Olive street. At about 4:30 plaintiff, in company with White and plaintiff's son-in-law, Camp, went to the house, 1812 Olive street; were secreted by White in the room next to Morgan's, where White left them. Soon after, the defendant, in company with the man Morgan, entered Morgan's room, remained there for more than an hour, and while there defendant had sexual intercourse with Morgan. The plaintiff, with two other witnesses, had a view of everything that transpired in Morgan's room, by means of holes through the connecting door, through which they commanded a view of Morgan's room.

"Morgan and White were one and the same person. Plaintiff did not know this fact until he saw Morgan enter the room with defendant. Then he could see—and did see—that the man in company with his wife was his agent, White. It may be suspected that plaintiff knew of this identity before he went to the house 1812 Olive street, but there is nothing in evidence from which such a conclusion is a necessary inference, or, to my mind, a natural one. I can not draw such inference from the testimony. Plaintiff denies such knowledge.

"Counsel for defendant attempted, with great skill, to induce plaintiff to admit on cross-examination that he wanted White to catch his wife in the act; but plaintiff put himself

on safe ground when he stated that he did not want, but 'expected' it. Plaintiff here—and I think honestly; he certainly did not know the law—observed the proper distinction between a corrupt motive and the mere desire to obtain proof.

"I further find that this man Morgan introduced himself to the defendant on September 30, 1898. According to her story, she saw him but three times, and then in the presence of others, before she went to his room on October 7. She wrote him the note above set forth on October 6.

"Her story as to believing herself in a real estate office, and that she was drugged, I reject entirely. It does not appear that there was any element of temptation, or seduction, or opportunity for same on the part of Morgan. I am impressed with the belief, from all the evidence, that defendant was ready and willing when she first met Morgan to respond to a criminal invitation from him.

"Under the foregoing facts, can the husband be held to have consented to the act of which he now complains?

"If there were any element of seduction in this case, or if the husband had afforded to this agent any opportunity for seduction; if the parties had been thrown together in social intercourse in such a way as to enable the agent to practice upon the woman any arts, wiles or temptations; if there were any evidence tending to show that the wife fell because of the act of this agent of the husband, then I should not hesitate to say that the husband should be barred. But where the evidence shows that the wife made an assignation with a man who was a total stranger to her and whom she had not met under any circumstances of intimacy, and where her conduct was and had been of such a character as to induce a reasonable belief that she was ready and willing, when she first met Morgan, to respond to his invitation, I do not think she should escape the consequences of her crime because her male companion was the agent of her husband, even if it should appear that her

husband was an eye witness to the act and as such saw that the male companion was his agent.    .

"The act of the husband in employing White undoubtedly contributed directly to the act of adultery of which he now complains. But there was no corrupt motive, and therein lies the distinction.

"The law deals with facts, and the charge of adultery in this case must rest upon the act of adultery committed with her husband's agent. Yet before this fact can bar the husband, it must appear that the act of adultery resulted from some inducement, persuasion or temptation for which the husband by reason of either direction or permission with corrupt motive is responsible. Under the facts in this case I must hold that the husband did not consent to the act, and that he is an innocent party. Nor do I think that considerations of public policy stand in the way. Rules founded on public policy must be of a general application, hence objections of this character must go to the right of a husband to employ an agent to watch his wife and obtain proof, on the grounds that such employment makes it possible for such agents to corrupt innocent wives. It is sufficient answer to this to say that under all the authorities, the law permits such employment. Furthermore I can not see why chaste wives require such an appeal to public policy for their protection."

In divorce proceedings an appellate court will examine the evidence for itself and draw its own conclusions therefrom, not being bound by the finding of facts made by the trial judge. Morris v. Morris, 60 Mo. App. 86; Davis v. Davis, 60 Mo. App. 545; Green v. Green, 22 Mo. App. 494. But where the testimony was oral and is conflicting, on account of the superior advantage possessed by the trial judge for weighing the testimony and judging of its credibility, an appellate court will give much deference to his conclusions of fact. Clark v. Clark, 48 Mo. App. 157; Stephenson v. Stephenson, 29 Mo. App. 95; Nichols v. Nichols, 39 Mo. App. 291; Parker

v. Roberts, 116 Mo. 657; Cobb v. Say, 106 Mo. 295; McElroy
v. Maxwell, 101 Mo. 294. The testimony on the trial of the
case in hand was all oral; it was conflicting, and a great deal of
it came from witnesses of a shady character, so that correct
conclusions of the facts are dependent mainly on the credi-
bility of the witnesses; the trial judge gave the greater credi-
bility to the plaintiff and his witnesses; deferring to his supe-
rior opportunity to correctly weigh the testimony, we are
disposed to adopt his conclusions of the facts. The learned cir-
cuit judge found as a fact, that the act of respondent in em-
ploying White contributed directly to the act of adultery he
complained of; but that there was no corrupt motive, and that
respondent did not hire White to commit adultery with his
wife, or to procure her to commit the offense with any
person. The question of law in the case is, may a husband
who has good grounds to believe his wife unfaithful, hire a
detective to watch her, and may he, when notified by his de-
tective that his wife has made an appointment to meet a man
for the purpose of having illicit intercourse with him, go to the
appointed place, secret himself, and there witness, without
protest or interference, an act of adultery between his wife
and his hired agent, without being guilty of such misconduct
as to bar his action for divorce, grounded on the act of adultery
thus witnessed by him, when he did not know it was his agent
who was with his wife, and did not employ him to commit the
act? A party seeking a divorce must, as in a court of equity,
come into court with clean hands; he must be both an injured
and innocent party. Nagel v. Nagel, 12 Mo. 53; Duncan v.
Duncan, Ibid, 157; Morrison v. Morrison, 62 Mo. App. 299;
Lawlor v. Lawlor, 76 Mo. App. 637. Section 4507 of the
Revised Statutes 1889, provides: "If it shall appear to the
court that the adultery, or other injury or offense complained
of, shall have been occasioned by the collusion of the parties,
or done with an intention to procure a divorce, or that the
complainant was consenting thereto, or that both parties had

been guilty of adultery, then no divorce shall be granted."
The adulterous act complained of was not done by the col-
lusion of the parties, nor for the purpose of obtaining a divorce
—was it done by the consent of the respondent in the sense the
word is used in the statute? Construing the word in con-
nection with other words and phrases used in the same section
of the statute, we think it means something more than a mere
passive acquiescence in the act; it signifies to connive, to agree
to, to be willing that it should be done, in the sense that "Saul
was consenting unto his (Stephen's) death." (Acts VIII-1).
The learned circuit judge found that the respondent in em-
ploying White directly contributed to the act of adultery of
which he complained, but that his motives were not corrupt.
Respondent testified that he was notified when and where the
act would be accomplished; that he repaired to the place
designated at the hour the crime was to be committed, and saw
it done. He testified that when he went there he expected the
act would be done. He told his detective Callan that he
wanted a divorce, and that he wanted to catch his wife in a
compromising position, so that he could get a divorce, and so
that she could get none of his property. He told White that
he wanted to see the act himself; that he had suspected her vir-
tue since 1890, and that he wanted him to watch her and ex-
pected him to catch her in the act. On her return from No.
1812 Olive street to their home, he stated to his children, in
her presence and hearing, "I accomplished what I wanted to,
I got her dead to rights. I had to pay damned dear for it, but
I succeeded at last." It was his hired agent who made the
appointment with his wife, and who committed the act with
her, and the act was committed by him because of his em-
ployment by respondent, to earn his fee, and to do what he
was hired and "expected" to do; namely, to furnish ocular
proof to his principal, (the respondent) that his wife was
unfaithful. In the face of all these facts, we must answer

Torlotting v. Torlotting.

the foregoing question in the negative, and hold that the respondent was consenting to the act of which he complains within the meaning of section 4507, *supra*. But for his employment of White to watch his wife, and to furnish him ocular proof of her infidelity, the act of which respondent complains would not have taken place, and the learned circuit judge was correct in finding as a fact, that respondent directly contributed to the act in employing White to watch his wife. White was the agent of respondent in this matter; he was hired to furnish the evidence which he did furnish; he was not restricted as to the means he might employ for the purpose; he was not only to watch, but he was "expected" to furnish the wanted evidence. In such circumstances it seems to us that it would be doing violence to reason and the law of agency, to say that the respondent was not consenting to the act, and that he was not guilty of connivance. 2 Bishop on Mar. & Div., sec. 216; Dennis v. Dennis, 68 Conn. 186. We do not wish to be understood as holding that a husband, who reasonably suspects his wife of infidelity, may not himself watch her and employ agents to watch her, for the purpose of discovering whether the suspect is or is not guilty, or that when he suspects his wife is about to commit the act of adultery, he is bound to try to prevent the act; on the contrary in such circumstances we think he may, without being chargeable with connivance, permit his wife to proceed far enough in the commission of the act to discover to a certainty her lewd disposition. As is said in Wilson v. Wilson, 154 Mass. 194: "The law does not compel a husband to remain always bound to a wife whom he suspects, and it allows him, as it does other parties who think they are being wronged, reasonable scope in their efforts to discover whether the suspect is or is not guilty, without themselves being guilty of connivance." To the same effect are the cases of Rierson v. Rierson, 52 N. Y. Supp. 509 and Krager v. Krager, 24 N. Y. Supp. 219. But if, as in this

case, he so conducts himself as to directly contribute to the act of which he complains, he is guilty of connivance.

For the reasons above stated, the judgment is reversed, with directions to the trial court to dismiss the plaintiff's bill. All concur.