Lynda Kay HARWELL, Plaintiff-Appellant,

v.

William Robert HARWELL, Defendant-Respondent.

No. 23435.

Kansas City Court of Appeals. Missouri.

March 5, 1962.

James R. Herrington, Kansas City, for appellant.

Lee D. Seelig, Kansas City, for respondent.

CROSS, Judge.

Plaintiff appeals from a judgment dismissing her petition for divorce, granting the defendant a divorce on his cross-petition, and awarding defendant custody of their infant daughter.

Plaintiff and defendant were married August 25, 1957, and lived together until their separation in May, 1960. One child was born of the marriage—the mentioned daughter, whose age at the time of trial in February, 1961, was two and a half years.

On May 2, 1960, plaintiff left defendant, took the child with her, and moved into a hotel. She filed her petition for divorce on May 4, 1960, charging defendant with indignities.

Defendant's first responsive pleading was an answer in the nature of a general denial filed on June 13, 1960. However, after the occurrence of certain events shown in evidence, and on December 7, 1960, he filed an amended answer and cross petition charging plaintiff with indignities, association and improper conduct with other men, and alleging that plaintiff committed adultery since the date of the separation.

Plaintiff submitted no evidence other than her own testimony, which was essentially to the effect that defendant refused to help with the child and wasn't concerned with what was needed in the home; that he used vulgar and violent language and swore at her; that he would stay out late hours, usually on pay days, and had come home intoxicated a few times; that he frequently ridiculed her ideas and attitudes; that he criticized her and said he didn't love her and was tired of their marriage; and, that defendant struck her on two occasions.

Defendant admitted in his testimony that he slapped plaintiff on one occasion during an argument. He testified that she hit him with her fist and that before he could even think, he slapped her with his open hand. He stated that was the only time he ever used violence toward plaintiff. Defendant denied that he ever came home intoxicated or stayed out late at night except as required by his attendance at a night school course in mathematics at Junior College, and by his performance of a part time job at night. Otherwise, defendant's evidence consisted principally of testimony concerning plaintiff's association with a man named J———— R————.

By the latter part of June, 1960, plaintiff had moved from her hotel abode to take up residence in the home of one Mrs. Jo Ann Fowler in Grandview on a "split cost" arrangement. The household consisted of Mrs. Fowler, plaintiff, and plaintiff's daughter. Mr. Fowler was in military service, stationed at Fort Riley, Kansas.

Plaintiff procured Mrs. Fowler's attendance at the trial but did not offer her as a witness. At the conclusion of plaintiff's testimony, defendant called Mrs. Fowler to the stand and examined her. She testified (with expressed reluctance) in part as follows: In November of 1960, plaintiff and Mrs. Fowler were at a dance where plaintiff became acquainted with the man named J———— R————. After that occasion, and in the months of November and December, 1960, J. R. was a visitor at the Fowler house. How many times, the witness couldn't remember for sure. In December he was there about five times. On occasion, when Mrs. Fowler went bowling early in the evening J. R. was there at the house with plaintiff and her child and was still there on Mrs. Fowler's return from the bowling alley around midnight. In November, 1960, plaintiff and J. R. went to a party together. They returned some time after Mrs. Fowler had retired. One morning in November, 1960, Mrs. Fowler, her husband (then on leave), plaintiff and J. R. had breakfast together in the Fowler home. Mrs. Fowler stated she didn't know whether J. R. had stayed there all night. She didn't know how it happened that he was eating breakfast there. She testified: "Everyone was up before I got up."

Mrs. Doris Atwood, who lived in Grandview across the street from Mrs. Fowler, testified on behalf of defendant that several times plaintiff spoke in conversation of J. R.; that plaintiff remarked that she had an appointment with him; that she and J. were taking her child to the circus; that J. was baby sitting with the child while plaintiff went to "choir"; and, that plaintiff had J's identification bracelet. Mrs. Atwood saw the bracelet and the name of J———— R———— on it. One Sunday morning the witness saw J. R. washing plaintiff's car in the Fowler driveway, and saw plaintiff and J. R. together take laundry to the launderette.

Defendant adduced evidence in detail relating to plaintiff's association with J. R. on the specific nights of December 1st through December 5th, 1960. That evidence consisted of testimony given by defendant himself and four other witnesses, all of whom had kept watch at the Fowler house during the time in question, tending to establish the following facts and circumstances:

On the night of Thursday, December 1, 1960, Mrs. Fowler drove away from her home about 6:30 P.M. At approximately 7:30 P.M. J. R. arrived in his automobile, parked it in front of plaintiff's Chevrolet and entered the house. At the hour of 2:30 A.M. he was still in the house and all the lights in it were turned off.

On the night of Friday, December 2, 1960, at about 11:45 P.M., J. R. again drove his car to the Fowler house, parked in front of plaintiff's Chevrolet and went into the house. Although a watch was maintained, he was not observed leaving the house, and at the hour of 2:30 A.M. his car (and plaintiff's) were still parked as they were when he arrived.

On the night of Saturday, December 3, 1960, plaintiff and J. R., riding together in plaintiff's Chevrolet, drove up and stopped in front of the Fowler house at approximately 8:45 P.M. They sat there in the car hugging and kissing for about 15 minutes. They then drove away but returned at about 9:30 P.M. and went into the house. They came out at 10:30 P.M. and drove off again. They returned about midnight and re-entered the house. In about 15 minutes all the house lights went out. Then the bedroom light went on for about 20 minutes, after which it was switched off. J. R. was still in the darkened house at the hour of 2:00 A.M.

On the night of Sunday, December 4, 1960, Mrs. Fowler, her husband (apparently home on leave) and the child of the parties were observed leaving the Fowler house in an automobile at about 9:20 P.M. In their absence, and at about 11:35 P.M., plaintiff and J. R. drove up to the house in separate cars. J. R. got out of his car and into plaintiff's Chevrolet. They sat there together for about 20 minutes hugging and kissing. After that they went into the house about midnight. At 12:30 Mrs. Fowler and the child returned. At one o'clock all house lights were turned off. At two o'clock the porch light came on and J. R. came out of the house followed by plaintiff who was in her pajamas. She put her arms around the man and kissed him for about three or four minutes. He then drove to Gebaur Air Base (to which he was followed by an observer).

On the night of Monday, December 5, 1960, plaintiff and J. R. drove up to the Fowler house together in plaintiff's car. After some hugging and kissing, they got out of the car and entered the house. All lights went off at 12:30 o'clock. No lights in the house appeared until 2:30 o'clock when the porch light went on. Plaintiff then drove J. R. to the air base.

Plaintiff's position in this case is not one of advantage. She has filed no pleading to deny defendant's cross petition which charges her with conjugal infidelity. She does not testify in denial of defendant's evidence tending to establish her marital misconduct. She has even refused to be cross-examined on that subject—on advice of her (trial) counsel who instructed her that she had a constitutional privilege against self-incrimination. Upon objection made by her counsel on such ground of constitutional immunity, sustained by the trial court, plaintiff abstained from answering the following questions (among others) propounded by defendant's counsel:

"Q  Do you know a gentleman by the name of J——— R———?"

"Q  Now I will ask you whether or not you ever had any sexual relations with a gentleman by the name of J——— R———?"

"Q  Were you ever in a Chevrolet automobile on any of these evenings with one J——— R———?"

"Q Between December 1, 1960 and December 6, 1960, were you in the bedroom of your home with one J—— R——?"

"Q During that time did Mr. J—— R—— on any of those occasions remain all night in your home?"

■ Plaintiff's claim of privilege has been disastrous to her welfare in this case. The immunity she invoked only served to prevent testimony which might be used against her in a subsequent criminal action—not to keep out probative evidence or any inferences relevant to the issues here. As stated in 98 C.J.S. Witnesses § 455, p. 308: "So, while the claim of privilege may not be used against defendant in a subsequent criminal prosecution, an inference that his testimony would have been unfavorable to him is available to his opponent in a civil cause in which defendant pleads the privilege". The consequences of a witness's refusal to answer pertinent questions on cross-examination are severe. Generally, where a witness refuses to answer such questions on cross-examination, his testimony on his direct examination will be stricken, especially where the witness is a party testifying in his own behalf. 98 C.J.S. Witnesses § 373, p. 126.

Although the trial court took no action to strike plaintiff's testimony, her refusal to answer pertinent questions has necessarily given rise to a strong inference against her that if she had given answers she would have corroborated the testimony of defendant on the subject matter of the questions. Apparently plaintiff has some realization of her predicament since she makes no point in her brief that she was not a guilty party or that defendant was not an "injured" party.

Plaintiff presents only one assignment of error in respect to the issue of divorce, to-wit: that respondent, by his own admission, is not an *innocent* party. Plaintiff says it is' not enough that a party seeking a divorce prove that he is an *injured* party,

but that he must also prove he is the *innocent* party—that he must come into court with "clean hands" and without fault or dereliction. Therefore, plaintiff argues, because defendant admitted that on one occasion he slapped her, he was thereby proven guilty of breaching his marital duty and cannot be considered to be an *innocent* party.

■ Defendant's single instance of admitted indignity to plaintiff—slapping her in sudden retaliation to her own blow—is not sufficient to destroy his status as an innocent and injured spouse, or to brand him as a "wife beater" of the species excoriated by this court in Libbe v. Libbe, 157 Mo.App. 701, 138 S.W. 685. We do not condone defendant's ungallant act committed in momentary anger. However, it is to his credit that he said of the incident "I am not proud of it". Nor do we find from the whole record any testimony of sufficient import to warrant a finding that defendant is not an "innocent" party.

■ The degree of innocence that must inhere in a party for him to be entitled to a divorce "does not mean that his conduct towards and his treatment of [his spouse] need on all occasions have been letter-perfect and above all reproach, for if this were so, few divorces if any, could ever be granted". Rowland v. Rowland, Mo.App., 227 S.W.2d 478. On the contrary, as stated in Stevens v. Stevens, Mo.App., 158 S.W. 2d 238, the conduct of one party will not prevent him from being adjudged an innocent party unless his conduct was such as to entitle the other party, prima facie, to a divorce.

■ The sufficiency of "indignities" to justify the granting of a divorce has been defined in Garton v. Garton, Mo.App., 246 S.W.2d 832, as follows: "It has been said, 'Indignities, such as to warrant the granting of a divorce, (or the denial thereof) ordinarily must amount to a continuous course of conduct. A single act, or occasional acts, will not suffice. The course of

conduct must be such as to connote settled hate and a plain manifestation of alienation and estrangement.' Haushalter v. Haushalter, Mo.App., 197 S.W.2d 703, 708". Such conduct on the part of defendant is not shown in this case. Even if we chose to believe the truth of plaintiff's testimony, we would not consider the "indignities" she attributes to defendant sufficient to entitle her to a decree of divorce. As the court said in Elgin v. Elgin, Mo.App., 301 S.W. 2d 869, "If we assume that all that plaintiff said about the defendant was true, she would not have been entitled to a divorce and consequently he is the innocent party".

■ However, we do not accept plaintiff's testimony as true. The evidence touching defendant's conduct and his status as an innocent party is conflicting. We therefore apply the rule that due deference will be accorded by the appellate court to the findings of the trial court when there is a conflict in oral testimony. That rule is stated in Randall v. Randall, Mo.App., 284 S.W.2d 64, as follows: "The trial court observed defendant on the witness stand and heard her testimony. According to her testimony, plaintiff was guilty of misconduct such as to justify defendant being granted a divorce; and her testimony was to the effect that she was guilty of no misconduct such as to bar her from a divorce on that ground. The judge found that issue for defendant. We will defer to that finding, it being based on conflicting oral testimony. Section 510.310, subd. 4 RSMo 1949, V.A.M.S.; Bryant v. Bryant, Mo. App., 232 S.W.2d 199, 204".

We resolve the question of credibility in favor of defendant and find that his testimony is worthy of belief where it conflicts with plaintiff's. Our resolution of the question is not alone from deference to the views held by the trial judge. We have taken into consideration the fact that plaintiff's testimony stands alone and without corroboration. We also look to the reasonableness or unreasonableness of her testimony. All of the evidence indicates that defendant is a moral, industrious man who worked all day to provide for his family and who went to school at night to advance in his employment. He also worked at night to augment his income. He placed his earnings in a joint bank account, unrestrictedly available to plaintiff. He is a good father who loves his child. The home he worked for and provided was destroyed by plaintiff's abandonment of it. Even plaintiff attests to defendant's conjugal fidelity by these words, in her brief: "There is no allegation in any part of this matter that defendant was ever interested in any woman other than his wife, and this point will not be argued here". Under these facts it is not reasonable to believe that defendant was guilty of the indignities defendant charged against him and narrated in evidence. Finally, plaintiff's own conduct, wrongful in nature and tacitly admitted, invites no confidence in her moral stability or credibility.

■ Under the record before us, we are constrained to find that defendant has established the allegations of his cross petition by convincing evidence, that he is both the innocent and injured party, and that he is entitled to a decree of divorce from plaintiff.

Plaintiff's remaining assignment is that the trial court erred in awarding custody of the minor child to defendant. Plaintiff contends for the child's custody under the rule that very young children, particularly young girls, should be in the care and custody of their mother unless she is demonstrably unfit as a custodian.

■ There is no absolute rule by which it can be determined which of two contesting parents should be given custody of a child upon their separation, but each case must be judged on its own facts. We so stated in Tootle v. Tootle, Mo.App., 329 S.W.2d 218. We further said in that case, "Usually the custody of children is awarded to the party who prevails in the divorce action. Wells v. Wells, Mo.App., 117 S.W.2d

700; Wilson v. Wilson, Mo.App., 260 S.W. 2d 770, 776. Our courts have said that 'all things being equal', a child of tender years should be given into the custody of the mother. Keith v. Keith, Mo.App., 95 S.W. 2d 669, 672. But the 'guiding star' which the courts must follow in determining the question of custody is the welfare and best interests of the child. There is an additional well settled rule 'that the findings of the trial court in matters involving the custody of a minor child of divorced parents, while not binding upon the appellate court which must review the record for itself, are nevertheless not to be lightly disturbed, and will be deferred to unless the appellate court is firmly convinced that the welfare of the child requires some other disposition.' Lutker v. Lutker, Mo.App., 230 S.W. 2d 177, 179". And, as stated in Ragan v. Ragan, Mo.App., 315 S.W.2d 142, "There is no paucity of cases demonstrating that, where the best interests of a child will be served thereby, custody will be awarded to the father".

█ We have carefully weighed the facts in this case in the light of *all* the rules applicable to the grave question before us. As is our duty, we have given deferent consideration to the findings of the able trial judge who saw and heard the parties testify. We are not disposed to disregard those findings. We cannot say that they are in conflict with the preponderance of the evidence or that the trial court abused its discretion in awarding the child's custody to defendant. We approve the findings of the trial court on this issue and adopt them as our own.

We are firmly convinced that the child's welfare will be best served by leaving her in the custody of her father. Plaintiff has made no showing of her suitability as the child's custodian. There is evidence otherwise—proof of her moral dereliction and lack of spiritual values. Plaintiff is not employed. She is still living at the Fowler house. There is no testimony to show whether plaintiff would keep the child there or at some other place if she were awarded custody. Plaintiff is silent as to her plans, aims or objectives for the child's future.

Defendant is the innocent party, guilty of no moral fault. He has shown himself able to afford the child physical and emotional security in a properly moral and religious environment, attended by love and affection. He has provided a suitable and proper home for his child, in a household that would include defendant, his child, and Mrs. Bess Harwell, his mother. Mrs. Harwell has independent means, is not employed, and is able to devote herself to the care of her son's child.

In accordance with our findings, we affirm the trial court's judgment.

All concur.