B——— E. G———, (Plaintiff) Respondent,

v.

G——— R. G———, (Defendant) Appellant.

No. 31445.

St. Louis Court of Appeals.
Missouri.

Jan. 21, 1964.

Charles E. Wells, St. Louis, for appellant.

Claude W. McElwee, St. Louis, for respondent.

WOLFE, Judge.

This is an action for divorce brought by B——— E. G——— against her husband, G——— R. G———. The defendant filed a cross-bill, and upon trial there was a finding and decree for the plaintiff on her petition and against the defendant on his cross-bill. The defendant prosecutes this appeal.

The plaintiff's amended petition alleges that she was lawfully married to the defendant on May 28, 1949, and that they lived together as husband and wife up to February 11, 1961. She makes the customary allegations that she treated her husband with kindness and affection, and that her husband offered her indignities that made her condition as his wife intolerable.

The indignities pleaded were that the defendant quarreled and nagged; stated that he no longer loved her; used foul language toward her; was gloomy and moody; accused her of associating with other men; that he had a violent temper, and that he pushed, struck, kicked her and threatened her with a knife. She alleged that he tore the telephone from the wall so that the police could not be called. She further alleged that he had been cold and abusive toward her in the last two years

of their married life. It was also alleged that the defendant denied being the father of her last-born child, born after the institution of this suit. The petition alleges that three children were born of the marriage, the youngest being a boy who was born October 14, 1961.

The defendant in his answer to the petition admitted the marriage and the paternity of the two older children. He denied all other allegations except that he had charged the plaintiff with associating with other men. He admitted charging her with such association, but averred that the charge was true. He denied that he was the father of the youngest child. In the cross-bill of the defendant he alleged that he lived with the plaintiff until February 11, 1961, but stated that he had no sexual relations with her after November of 1960. He charged her with associating with one E——— L. S———. He also alleged that the plaintiff refused to have sexual relations with him after the birth of their second child. He alleged that the plaintiff told him that she wished she had never married him, and that she had threatened him. In the cross-bill the defendant asked for divorce and custody of the two older children.

It was upon the issues thus presented that a trial was had. Plaintiff's evidence was to the effect that for the past five years the defendant often used violent and profane language toward her. She testified that on seven or eight occasions in the two years prior to the trial her husband had beaten or struck her. She said that on two or three occasions the police had been called. She testified that her husband had threatened her with a steak knife on New Year's Eve of 1960. She said that he picked up the steak knife in the presence of her uncle and children and said, "I should kill you right now." She said that during the last three years of her married life he had called her a slut and a whore.

The plaintiff was asked, on direct examination, if she knew the Mr. S———, with whom her husband had charged her with associating. She said that she met him when she started patronizing a filling station where he worked. She said that he had driven her home from the filling station at times and then took her car back for servicing. She had called him to drive her with one of her children to the doctor's when she had no car.

She and her uncle wanted to buy a Cadillac, and upon the recommendation of S——— they called upon a salesman who sold them a Cadillac. She traded a Nash Rambler in on the Cadillac. Title to the Nash Rambler was in the names of plaintiff and defendant, and she signed her husband's name to the certificate of title to make the necessary transfer at the time she acquired the Cadillac.

The plaintiff had some farm property in Indiana, the value of which she estimated at $100,000, and from which she received an income of sizeable proportions annually. She stated that on December 10, 1960 she wanted to take a trip to the farm, and that she was having some trouble with the accelerator pedal on the Cadillac. She arranged with S——— to drive the Cadillac to Effingham, Illinois, to see what was the matter with the accelerator. She said that she followed him later in S———'s Oldsmobile and picked up the Cadillac in Effingham.

S——— arrived at a motel in Effingham on December 9, according to the motel register, and his own admission in depositions taken. He arrived with a woman and registered as "Mr. and Mrs. E——— S———." The registration bore the notation that he was driving a Cadillac bearing a license number which was the same as the license number on plaintiff's Cadillac. When S——— was asked who the "Mrs. S———" was that had registered with him, he said that he did not remember. He also said that so far as he knew, there was nothing wrong with the accelerator on the Cadillac and that he had not heard anything about that.

Mrs. G———'s story of the episode is that she went to Effingham later driving S———'s Oldsmobile and changed cars there and drove on to her farm. She said that she left St. Louis in S———'s Oldsmobile at four thirty o'clock in the morning of December 10. She had left her home on the 9th in the afternoon, and went to a friend's house at 8:30 p. m. and sat and talked until 4:30 a. m., at which time she left. The friend corroborated her statement as to the time of her departure and said that plaintiff was driving an Oldsmobile.

Plaintiff was asked about a trip to S———'s home, which was then with his parents in Mayfield, Kentucky. She testified that she went to visit his parents there. She said that she met them through an aunt, whom she had met at the filling station in St. Louis County where S——— worked. She was asked how long her visit extended, and she said she did not know how long it was. She could not say whether it was a week, more or less. She was at first equivocal as to whether or not S——— was present at his parents' home at the time of her visit there, but later said that he was there at the time and she did not know how many times she had seen him in Kentucky.

She took the trip to Kentucky in an Oldsmobile station wagon that she had purchased a short time before and kept in Indiana. She said that when she returned from her trip, she left the car in East St. Louis by a parking meter with the keys locked in it. She testified that she had made arrangements with someone of the S———'s family to pick it up and drive it back to Mayfield, and that so far as she knew the car was still with them in Mayfield. She said that she wanted the S——— family to use it.

The defendant's denial of the mistreatment of which his wife complained was rather categorical. His explanation of the episode in which, according to plaintiff, he threatened her with a knife was more detailed. He said that he had not threatened her with a knife, but that they had quarreled because her uncle was visiting them. He did not want her uncle in the home with the children because at the time he was on parole from a penitentiary sentence. The defendant produced a valentine and a Christmas card which he said were sent to his wife by S———. The wife had previously denied having received them, and S——— in his deposition denied knowing anything about them.

There was evidence that S——— had charged over $100 for gasoline on a credit card issued by the gasoline company to the defendant. Mrs. G——— said that it was given to S——— by her husband when the two were considering opening a filling station. G——— denied this and said that his wife had made application for the card in question, and that he did not know about it or the charge made until he received a bill. S——— admitted charging to G———, gasoline for private trips that he had made, but said that he later gave Mrs. G——— a check made out to cash for part of the gasoline so purchased.

A neighbor woman with whom Mrs. G——— had been friendly testified on behalf of defendant that Mrs. G——— told her she was going with a Mr. S———. Mrs. G——— did not take the stand in rebuttal or deny that she had made the statement.

The court ordered a blood test of G——— and of the last-born child. The test and report showed that a person having blood grouping of G——— could have been the father of the child, but it specifically stated, "These data of course cannot be used to prove paternity." There was additional evidence, but it added very little to the substance of the facts which we have set out above.

As stated, the trial court awarded Mrs. G——— a divorce. Our review of the court's judgment is governed by Section 510.310, RSMo 1959, V.A.M.S., which requires us to review "both the law and the evidence as in suits of an equitable na-

ture." This section also requires us to give due regard to the opportunity of the trial court to judge the credibility of the witnesses. Mayor v. Mayor, Mo.App., 351 S.W.2d 810.

The court became concerned with the question of the paternity of the child last born to the plaintiff. It concluded that the evidence did not overcome the presumption of legitimacy of children born in wedlock. The law as it relates to this is clearly stated in F——— v. F———, Mo.App., 333 S.W.2d 320.

Whether or not the court properly ruled upon that issue need not here be considered, for the plaintiff had the burden of proving that she was the *innocent* and injured party. This "requirement is neither more nor less than an application of the equitable doctrine of 'clean hands' to a divorce action." Franklin v. Franklin, 365 Mo. 442, 283 S.W.2d 483. The plaintiff did not meet this burden. By her own testimony she committed indignities that were harmful to the family relationship by her dalliance with S———, if it could be said it was nothing more than that. Crowley v. Crowley, Mo.App., 360 S.W.2d 293; Easton v. Easton, Mo.App., 361 S.W. 2d 166.

The court apparently believed the plaintiff's evidence as to the alleged indignities committed by the defendant, and was therefore not in error in refusing to grant the defendant a divorce. It erred, however, in granting a divorce to plaintiff.

The plaintiff has filed in this court a motion to modify an alimony award made to her. This motion is overruled.

Both parties are denied a divorce, and the cause is reversed, with directions to enter a decree for the defendant on the plaintiff's petition, and for the plaintiff on the defendant's cross-bill.

RUDDY, P. J., and ANDERSON, J., concur.